**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MACK INDUSTRIES, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE OF RIVERDALE, GEORGE | ) | |
| STINSON, CHRISTOPHER VAN DYKE,) | | |
| ALVIN JONES, JAMES BEATTY, | ) | JURY TRIAL DEMANDED |
| and TYRONE JARETT, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

NOW COMES the Plaintiff, MACK INDUSTRIES, LTD. (hereinafter "Plaintiff" or "Mack"), by and through its attorneys, Pittacora & Crotty, LLC, and for its Complaint for Declaratory Action, Injunctive and Other Relief ("Complaint') against VILLAGE OF RIVERDALE, ILLINOIS ("Riverdale"), GEORGE STINSON, CHRISTOPHER VANDYKE, ALVIN JONES, JAMES BEATTY and TYRONE JARETT states as follows:

## THE PARTIES

1.      Mack Industries, Ltd. is an Illinois corporation with a principal place of business located at 16800 Oak Park Avenue, Tinley Park, Cook County, Illinois.

2.      The Village of Riverdale, Illinois is a home rule municipality located in Cook County, Illinois.

3.      Defendant George Stinson ("Stinson") has been employed as a building inspector for the Village of Riverdale, Illinois at all times relevant hereto.  On information and belief, Stinson resides in Riverdale, Illinois. Stinson is also a former employee of Mack Industries, Ltd.

4.     Defendant Christopher Van Dyke ("Van Dyke") has been employed as Deputy Chief of the Riverdale Fire Department and a building inspector for the Village of Riverdale, Illinois at all times relevant hereto.  On information and belief, Van Dyke resides in Riverdale, Illinois.

5.     Defendant Alvin Jones ("Jones") has been employed as a building inspector for the Village of Riverdale, Illinois at all times relevant hereto.  On information and belief, Jones resides in Riverdale, Illinois.

6.     Defendant James Beatty ("Beatty") is an employee of the Riverdale Police Department.  On information and belief, Beatty is also a resident of Riverdale, Illinois.

7.     Defendant Tyrone Jarett ("Jarett") is an employee (and Chief) of the Riverdale Fire Department.  On information and belief, Jarett is also a resident of Riverdale, Illinois.

## JURISDICTION

8.     The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Judicial Code, § 1331 and § 1343(a); the Constitution of the United States; and this Court's supplementary jurisdiction powers.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Riverdale is located in this district and all of the events giving rise to this Complaint occurred in this district.

## GENERAL ALLEGATIONS

10.     Mack currently owns twenty-five (25) properties in the Village of Riverdale, and acts as property manager for fourteen (14) other homes.  Mack has been a landlord and property owner in Riverdale for approximately seven (7) years.

11.     Until early 2010, Mack had no significant issues or problems with Riverdale employees or inspectors as it relates to properties owned or managed by Mack.

2

12.     Mack did have minor issues with Stinson and other inspectors in Riverdale in 2009, however, these issues did not become significant until approximately the summer of 2010, when Riverdale officials Stinson, Van Dyke and Jones began a coordinated campaign of discrimination and harassment against Mack and its tenants.

13.     On information and belief, this campaign of harassment was originally based on Stinson's personal animus against Mack for terminating his employment in 2007, which reached a boiling point in 2010.

14.     On information and belief, Stinson enlisted the help of Jones, Beatty, Van Dyke and Jarrett to target Mack and its properties in late August/early September 2010.

A.      **11 W. 144th Street, Riverdale, Illinois**

15.     Mack purchased a property located at 11 W. 144th Street, Riverdale, Illinois (hereinafter referred to as the "Commercial Property"). Mack purchased the Commercial Property in July 2007.

16.     In July 2007, at the time of purchase, James McClelland ("Jim"), and authorized agent of Mack, met with Jim Stock (then-building commissioner of Riverdale), who advised Jim that Riverdale wanted two residential units, one retail space and one storage facility at the Commercial Property. Mack completed renovation of the Commercial Property according to Mr. Stock's directive.

17.     From July 2007 to August 2010, Mack did not experience any issues with the Commercial Property. However, in late August 2010, Mack obtained a commercial tenant for the retail space at the Commercial Property.

18.     In conjunction with the tenant's attempt to apply for a business license with Riverdale, Van Dyke conducted an occupancy inspection without notice to Mack or the tenant on

3

August 27, 2010. At that time, Van Dyke failed Mack on the occupancy inspection because it was purportedly not zoned for retail space. Riverdale denied Mack's tenant, Saving Lives, Inc., a business license for that same reason.

19.     Mack made multiple requests to get the occupancy report from the inspection from Riverdale, however, it took almost two weeks for Riverdale to provide it (two weeks in which the tenant was unable to operate at the space and during which Mack collected no rent) because Van Dyke was allegedly out sick. After numerous requests, counsel for Riverdale, Amy Kurson ("Kurson"), provided counsel for Mack, Jim Pittacora ("Pittacora"), with a copy of the zoning map for the area. The Commercial Property is zoned for mixed-use retail and residential, exactly the use for which Mack had attempted to use it.

20.     Only after Pittacora pointed out that the Commercial Property was zoned for mixed-use did Kurson forward a "punch list" of alleged violations that needed to be rectified prior to an occupancy permit being issued. By Kurson's own admission, this punchlist should have been provided immediately as that is the custom and normal practice of Riverdale's inspection process. Mack, however, did not receive this punchlist until October 4, 2010, well over a month after the inspection and more than two (2) weeks after the first inspection report was provided by Riverdale, which incidentally failed to mention any of the punchlist issues.

21.     Even after denying Mack an occupancy permit, Riverdale employees prohibited Mack's tenant from removing its belongings from the retail space until Pittacora contacted Kurson to request that Riverdale employees stop their harassment of Mack's tenant. Mack's tenant for the Commercial space was not allowed access to their personal property for several days.

22.    Currently, the retail space at the Commercial Property is vacant, as Mack cannot obtain confirmation from Riverdale that the zoning issue has been resolved, nor can it obtain an inspection from Riverdale to confirm that the alleged punchlist items have been corrected.

**B.    Crime-Free Ordinance**

23.    On information and belief, Riverdale enacted a Crime-Free Housing Program, Riverdale Municipal Code 15.120.010 (the "CFHP") in 2007.  Among other things, the CFHP requires that a property owner who leases residential property to tenants attach a "Crime-Free Lease Addendum," and to serve a ten-day notice and evict any tenant who engages, facilitates, or permits a member of the household, guest or other party under the control of the renter any criminal activity (not limited to violent criminal activity or drug-related criminal activity).  The CFHP also requires a property owner to conduct a criminal background check on potential tenants.  A copy of the CFHP and proposed sample lease addendum is attached hereto as Exhibit A.

24.    The CFHP does not allow a property owner to wait until a tenant, guest or member of the household has actually been arrested (let alone charged) with a crime to serve a ten-day notice.  The penalty for failure to follow the provisions in the CFHP is suspension or revocation of a village residential operator license (required by Riverdale in order to rent residential property), as well as a monetary fine.

25.    According to various Riverdale personnel, the CFHP has almost never been enforced because Riverdale lacks the resources to do so.  Indeed, Beatty's latest letter to Mack regarding the CFHP specifically stated that enforcement of the program was on a one (1) year hiatus.

5

26.     However, in July 2010, Mack began receiving notices from Beatty regarding purported violations of the CFHP at or around property located at 2 E. 137th Place, Riverdale, Illinois (the "137 Property"). Mack currently rents the 137 Property to Classy Bailey.

27.     On or about July 13, 2010, Mack's property manager, John Coakley ("Coakley"), received a "Notice to Landlord" from the Riverdale Police Department indicating that unnamed juveniles from 137th Place were throwing apples at another property and broke windows. The notice indicated that no arrests had been made. A copy of the July 13th Notice is attached hereto as part of Group Exhibit B.

28.     On or about July 16, 2010, Coakley received another Notice to Landlord from the Riverdale Police Department indicating that, on July 16, 2010, unnamed juveniles from 137th Place were hanging out on the porch of another property. Again, no arrests were made. A copy of the July 16th Notice is attached hereto as part of Group Exhibit B.

29.     On or about August 10, 2010, Coakley received another Notice to Landlord indicating that an 11-year old male (identified only as a "relative of Classy Bailey") stabbed another juvenile with a knife while being beaten by six other juveniles. The notice did not indicate whether any arrests had been made. A copy of the August 10th Notice is attached hereto as part of Group Exhibit B.

30.     Finally, on August 25, 2010, Coakley received a letter from Beatty at the Riverdale Police Department indicating that, on August 10, 2010, Classy Bailey was arrested for aggravated battery. The letter ordered Coakley to serve a ten-day eviction notice to all parties residing at 2 E. 137th Place within five days after receipt of the correspondence. Beatty also requested a copy of the criminal background check for this tenant. A copy of the August 25th Correspondence is attached hereto as Exhibit C.

31.     Thereafter, Mack obtained a copy of the arrest report from the August 10th incident.  The arrest report did not name Classy Bailey, nor did it indicate that she was arrested for aggravated battery as set forth in Beatty's August 25th correspondence.  Indeed, the arrest report named Angelina Armour as the party arrested for battery.  A copy of the arrest report is attached hereto as Exhibit D.

32.     Despite the fact that none of the incidents described above resulted in the arrest of Classy Bailey or of any charges filed against any residents of the 137 Property, Beatty issued a $300 citation against Mack on September 10, 2010 for failure to evict Classy Bailey or provide a signed addendum and background check for her.  A copy of the September 10th citation is attached hereto as part of Group Exhibit E.

33.     On September 15, 2010, Beatty issued another citation, this time in the amount of $500, related to Mack's failure to evict Classy Bailey or provide the requested documentation.  A copy of the September 15th citation is attached hereto as Group Exhibit E.

34.     Mack requested a hearing on these and other citations issued against Mack relating to various properties.  At the October 13th hearing, the two crime-free citations were dismissed because Riverdale could not lay proper foundation for admission of any documents or evidence in support of a violation of the CFHP.

35.     At the October 13th hearing, Beatty stated to Keith McClelland ("Keith"), an authorized agent of Mack, that Riverdale would simply issue new citations for violation of the CFHP and would ensure that the proper witnesses were present at the hearing to guarantee Mack's conviction.

36.     Indeed, another example of the broad, ambiguous and arbitrary method by which the CFHP is enforced by the Riverdale police is evidenced by an envelope sent to property

manager Eva Eppenstein (a Mack employee) from Officer Beatty of the Riverdale Police Department on or about September 25, 2010, outlining an alleged 8-month investigation of the tenants at a property managed by Mack and located at 14412 S. Normal, Riverdale, Illinois (the "Normal Property"). A copy of the letter directed to Eva Eppenstein is attached hereto as Exhibit F.

37. Although the tenant, Tina Moore, had not been arrested for anything during this eight-month investigation, Beatty nonetheless directed Mack to evict Tina Moore pursuant to the CFHP. In his letter to Ms. Eppenstein, Beatty noted that Naiquille Eady was arrested in August 2010, however, Naquille Eady had moved out of the Normal Property in August 2010. The letter further identified an arrest that had been made of Marquis Eady on July 24, 2010. On information and belief, neither Naiquille Eady nor Marquis Eady have been charged or convicted of any offense.

38. The envelope contained blurry pictures with notes attached purportedly explaining the activity taking place in these pictures. Not a single picture contains a recognizable individual or activity, and at least one of the pictures was not taken at the Normal Property. On the basis of these pictures and the two arrests, as well as several unverifiable allegations as to the conduct of occupants of the Normal Property, Beatty ordered Mack to evict her. *See* Exhibit F.

39. Although the letter invites Mack to contact various officers with any further questions, all of Mack's subsequent calls to Beatty to request information have been ignored.

**C.    Inspection for Certificate of Reoccupation**

40.    At all times relevant hereto, Riverdale Municipal Code set forth the obligation to appoint a Building Inspector for Riverdale, Municipal Code Chapter 2.32.010 *et seq.* (the "Code").

41.    Pursuant to the Code, a building inspector is to be appointed annually by the village president and remain in office indefinitely until a successor is appointed.  The Code, Ch. 2.32.010.  The Code requires that a building inspector only have "such training and experience as a civil engineer or superintendent of construction as may be deemed necessary by the village board."  The Code, Ch. 2.32.020.

42.    The Code affords the building inspector the latitude to employ/appoint assistants to aid him or her in carrying out the duties codified therein.  The Code, Ch. 2.32.040.  No qualifications are set forth for any duly appointed assistants referenced in the Code.  *Id.*

43.    The Code affords the building inspector the absolute right and authority to enter any building, structure or premises at any "reasonable" hour.  The Code, Ch. 2.32.100.  Refusal to allow entry by the building inspector or one of his or her duly appointed assistants is a misdemeanor under the Code.  *Id.*

44.    Section 130 of the Code sets forth the requirements for a landlord who wishes to re-rent an existing rental property:

> It is hereafter required that any residential unit within the village which is rented or leased for a fee, upon a change of occupancy or tenancy, must be inspected by the building inspector or his authorized representative.  Prior to the premises being occupied, a re occupancy certificate must be issued by the building inspector certifying that the premises comply with the applicable ordinances of the village and are fit for human habitation, which shall be in force and effect for sixty days from date of issuance.  The fees for the inspection as herein provided shall be fifty dollars.  If it is necessary that an additional inspection be made by the building inspector or his authorized representative, no fee shall be charged for said second inspection; provided, however, that any additional

inspections beyond two by the building inspector or his authorized representative shall be at a fee of one hundred dollars per inspection.

The Code, Ch. 2.32.130.

45.     As indicated herein, Stinson is a building inspector or authorized representative of the building inspector of Riverdale.  Stinson is also a former employee of Mack and has indicated on several occasions that he has a personal animus against Mack for, among other things, terminating his employment with them in 2007.  In fact, Mack is aware of several statements made to fellow Riverdale employees by Stinson that he would do whatever was necessary to ensure that "Mack goes down."

46.     Stinson began aggressively acting on this personal animosity against Mack in the summer of 2010, when he issued several violations against Mack within a two-week period, purportedly for violations of the Code relating to reoccupancy certification.

47.     Mack has owned and rented out a single family home located at 14428 S. Lowe, Riverdale, IL (the "Lowe Property") for over two years without incident.    In order to comply with the Code's required reoccupancy inspection, Mack scheduled an inspection in late August 2010.

48.     At the inspection, Stinson refused to issue a re-occupancy permit at the inspection based on a failure by Mack to install a security door on the rear screened-in porch for the Lowe Property.  The rear door of the actual building did have a security door, and in fact, it would be structurally unsound to install a security door on a rear covered porch such as called for by Stinson.

49.     Because it would be impossible to comply with Stinson's ridiculous requirement and obtain a re-occupancy permit, Mack obtained a tenant for the Lowe Property prior to re-inspection (but after the fist inspection and after all reasonable repairs identified by Stinson were

10

made by Mack). Stinson then issued a ticket with a $300 penalty to Mack on September 8, 2010 for failure to obtain the occupancy permit prior to re-occupation. A copy of the ticket is attached hereto as Exhibit G.

50. Indeed, a Mack employee waited on November 8, 2010 at the Lowe Property for a reinspection, only to call Riverdale in late afternoon and discover that said inspection would not be taking place because Mack had not paid the tickets set forth above (this in spite of the fact that the hearing date for these violations has not yet passed). In essence, Riverdale refused Mack a re-inspection unless/until it paid a fine for which it had no opportunity to contest, which is an unconstitutional denial of Mack's unequivocal right to due process.

51. Stinson has indicated on several occasions that he would do whatever he could to "make Mack pay."

52. Indeed, it appears that Stinson recruited two other inspectors, Christopher Van Dyke and Alvin Jones, to aid in his discrimination and harassment of Mack and its tenants. For example, on September 30, 2010, Alvin Jones showed up at property managed (but not owned) by Mack on 13846 State Street, Riverdale, Illinois (the "13846 Property") while Mack was conducting a walk-through for a tenant prior to occupancy. Mack had not been provided notice of any inspection to take place at that time.

53. At that time Jones made disparaging remarks about Mack and urged the tenant not to do business with Mack. Jones told Mack's tenant that Mack was a "bad landlord" and that she should not rent from Mack. Jones also told Mack's tenant that she did not have to pay her water bill for the property as that responsibility would ultimately fall to Mack if she failed to pay the bill.

54.     That same day, Mack contacted Riverdale to schedule a rental occupancy inspection for Monday, October 4, 2010 for the 13846 Property.  No representative from Riverdale showed up for the scheduled inspection.  Later, Mack learned that the inspection was cancelled because there was an outstanding water bill at the 13846 Property, despite the fact that, on information and belief, there is no codified policy in Riverdale whereby a property must not have an unpaid water bill to obtain an occupancy permit.

55.     As a result of Mr. Jones' conduct, Mack almost lost this tenant.  Moreover, Jones' comments have damaged Mack's business reputation and exposes Mack to risk as it relates to payment of the water bill for this property, which, per Mack's standard lease with its tenants, requires the tenant to pay the water bill.

56.     Stinson and his fellow inspector's conduct show no signs of abating.  On October 14, 2010, Stinson met Mack's employee at property located at 14319 S. Michigan Avenue, Riverdale, Illinois (the "Michigan Property") to do another rental occupancy inspection.

57.     Even though the Michigan Property had undergone a rental occupancy inspection before Mack had obtained a different tenant two years prior, Stinson did a "white glove" inspection and failed the Michigan Property for the following reasons: 1) failure to label the circuits in the garage circuit breaker box; and 2) failure to repair a sticky door in the basement.

58.     Further, during that same inspection, Stinson asked the current tenant whether any work had been done on the furnace or breaker box.  Mack and the tenant assured Stinson that both were existing and that they did no substantial work on the Michigan Property whatsoever other than touch up paint and cleaning.  Despite the fact that the tenant confirmed no work had been done, Stinson issued a $1000 citation against Mack for performing work on the furnace without obtaining a permit.  A copy of the October 14th citation is attached hereto as Exhibit H.

59.     Currently, Mack has been unable to schedule reinspection for the Property because it has been informed that the Michigan Property has an "in-law apartment" on the premises and is thus in violation of zoning laws (despite the fact that Mack does not rent out the "in-law apartment" separately, and despite the fact that Mack received a Certificate of Compliance for the Michigan Property from the Department of Building and Zoning in December 2008).

60.     Mack is the owner of property located at 14437 State Street, Riverdale, Illinois (the "State Property").  On October 7, 2010, Mack received a citation for failure to obtain an occupancy permit before renting the State Property to a tenant.  On October 8, 2010, Mack contacted Riverdale to set up an occupancy inspection, which was then scheduled for October 14, 2010.

61.     On October 14, 2010, Mack had a representative waiting at the State Property to walk with Riverdale's inspector through the inspection from noon to 5pm.  No inspector ever showed up for the inspection, however, at 3pm that very same day Van Dyke issued a citation for failure to obtain an occupancy permit for the State Property.  Mack had to call to reschedule the inspection, and has currently been unable to confirm a new inspection date with anyone at Riverdale.  Copies of the two citation notices issued for the State Property are attached hereto as Exhibit I.

62.     Since Mack, through counsel, alerted Riverdale officials to the above activity, Stinson, Van Dyke and Jones have made it impossible for Mack to obtain occupancy permits for any properties.  Mack employees attempting to set up inspections with Riverdale are ignored or told that inspections cannot be scheduled.  Inspections are cancelled without notice due to a

previously unknown (and unwritten) apparent policy of not issuing occupancy permits for properties with unpaid water bills or unpaid fines that have yet to be adjudicated.

63.     Indeed, Mack employees have been told that no permits will be issued for corrective work noted on inspection reports until *all* fines and dues allegedly owed by Mack for any property (including those fines that have not yet been adjudicated or are not even related to the property in question) are paid in full. Given that Riverdale inspectors are requiring Mack to obtain permits for work that has not in the past required permits (and is contrary to Riverdale's written policy regarding permit requirements), Riverdale has effectively prevented Mack from obtaining occupancy inspections from any property whatsoever. Even when inspections do take place, properties are failed for trivial, unrealistic items that went unnoticed or were deemed compliant at prior inspections conducted by Riverdale.

64.     Indeed, through this campaign of harassment, Mack has been deterred from purchasing any properties in Riverdale in the future, and has cancelled at least one purchase of property in Riverdale because of this harassment.

65.     Currently, Mack is unable to occupy four of the properties it owns in Riverdale due to this harassment. For each of these properties, Mack has a tenant ready, willing and able to move in but for Riverdale's refusal to issue an occupancy permit or conduct an occupancy inspection. Mack fears that as more Mack properties come up for lease renewal it will not be able to put tenants in these properties as Riverdale, through the above identified officials, has made it clear that Mack will never pass inspection.

**D.    Water Bills**

66.    Generally, as owner and landlord of hundreds of single-family homes in the Chicagoland area, Mack requires wherever possible for tenants to register all utilities in their name upon moving into a property, including water bills.

67.    Riverdale, unlike most other Chicagoland municipalities, only allows transfer of water bills to a tenant's name at its sole discretion and where it deems fit.  For the most part, Riverdale requires that water bills remain in a property owner's name.

68.    Riverdale Amended Ordinance 2009-07 amended Section 13.12.080 of the Municipal Code to specifically hold that bills for water service at properties would be issued every two months, and deemed delinquent fourteen days after their issuance.  Failure to pay within fourteen days would result in a ten percent penalty.  The provision also called for accounts not current within twenty days to be disconnected.  Riverdale Municipal Code Ordinance 2009-07 (the "Water Ordinance").

69.    The Water Ordinance also called for an owner to be ultimately responsible for payment of water service, with any tenant to be jointly and severally liable to pay for water service at a property.  Indeed, while the Water Ordinance allowed for duplicate bills to be issued to tenants at Riverdale's discretion, the Water Ordinance nonetheless held that accounts held in any name except that of the owner of a property would result in disconnected water service and a fine of $50.00 per day.  The Water Ordinance took effect on December 31, 2009.

70.    Given that Mack requires payment of water bills in the single family homes it owns pursuant to provisions in each tenant's lease, the end result of Riverdale's policy is that Mack becomes responsible for collection of unpaid water bills from its tenants.

71. Generally, a municipality will turn off the water and post a notice that the property is uninhabitable if a water bill is unpaid for a period of time. Mack fully supports this process, as it is an effective way of getting a delinquent tenant to come current on unpaid water bills. It also ensures that Mack's properties will be maintained properly and not unnecessarily damaged as a result of no water at the property.

72. However, despite the harsh penalty provisions and language of the Water Ordinance, Riverdale has been lax in its collection and enforcement of unpaid water bills. For example, with respect to the State Property, the tenant has incurred charges of $1500.00 in unpaid water bills. Mack has written to Riverdale in the past to notify them of the pitfalls of delaying collection and enforcement of unpaid water bills, and has not received a response other than a copy of the municipal code requiring that owners keep water bills in their names.

73. Mack has repeatedly requested that the water be turned off at the State Property. Instead, Van Dyke has issued numerous citations to Mack for allegedly illegally turning the water back on at the State Property.

74. There is simply no reason that Mack would turn water that had been shut off due to an occupant's unpaid water bills back on when the shut-off is the best way Mack has of ensuring its tenant will pay its utility bills. Further, as detailed above, Mack will be ultimately responsible for payment of the delinquent water bill so it is in Mack's best interest to ensure that the water is turned off sooner rather than later to minimize this exposure.

75. To date, Van Dyke has issued two $500 violation notices alleging that Mack is turning the water back on illegally, with absolutely no evidence or explanation to back up this claim. Indeed, after checking with the Riverdale water department, it has been impossible to even determine whether the water service at this property had ever been shut off. Mack has

16

requested a hearing on these citations, but anticipates this to be futile as Riverdale has clearly embarked on a pattern and practice of discrimination and harassment against Mack. Copies of the citations issued to Mack by Van Dyke are attached hereto as Exhibit J.

76. Moreover, Riverdale has recently begun using unpaid water bills as a reason to deny occupancy inspections as set forth above. Indeed, Samantha Walton, an employee of the Riverdale Building Department, denied Mack an occupancy permit inspection for property Mack owns that is located at 9 E. 140th Court, Riverdale, Illinois (and did not even let Mack's employee submit the application) due to an unpaid water bill purportedly from 2007 - Mack purchased the property (and obtained a water certification and transfer stamps) in 2008. As such, this could not possibly be Mack's obligation to pay.

**E.     Riverdale's Response**

77. Mack has made repeated and numerous attempts to discuss these issues with Riverdale. Indeed, Pittacora has been requesting that Kurson set up a meeting with Mack and Village officials for over a month. Kurson has not provided availability for Village officials. Kurson did offer to schedule a meeting between Mack and Riverdale officials, but it was too late as Riverdale continues to discriminate against, and harass, Mack.

78. Mack has repeatedly notified Riverdale and Kurson that Inspectors Stinson, Van Dyke and Jones, as well as Officer Beatty and Chief Jarett, are acting with a personal motive to harass him. Indeed, before or immediately after nearly every single instance outlined in this Complaint, Mack or its counsel notified Kurson and requested appropriate action be taken to resolve these issues.

79. Kurson has provided no substantive response, other than to notify Mack that its claims regarding Stinson and Officer Beatty were investigated, and that no abuse was found.

80.     Indeed, the harassment has increased since Keith McClelland and Mack's counsel attended the administrative hearing addressing some of the citations that have been issued against it in mid-October.  Since that time, the Riverdale inspectors and officials continue to target Mack's properties, even failing to abide by Riverdale ordinance.

81.     For example, Mack repeatedly requested over the last several months that Riverdale disconnect water service at a property it owns at 13831 S. Michigan Avenue, Riverdale, IL.  Finally, in early October 2010, Riverdale turned off the water and posted the disconnection notice.  However, after Mack paid the water bill on or about October 22, 2010, Riverdale waited almost seventy-two hours to turn the water service back on at the property (despite the fact that Riverdale standard policy is to do so within twenty-four hours).  This caused great inconvenience to Mack's tenant and exposes Mack to unnecessary risk for alleged breach of the lease with that tenant.

82.     On or about October 8, 2010, counsel for Mack sent two (2) requests for information pursuant to the Freedom of Information Act ("FOIA") to Riverdale, requesting: 1) copies of any and all citations, notices to landlords, or other documentation issued for or relating to violations of the CFHP; and 2) zoning classification history for the Commercial Property, including but not limited to notices of zoning violations.  Copies of the October 8, 2010 FOIA Requests are attached hereto as Group Exhibit K.

83.     Although the forms provided by Riverdale to submit FOIA requests indicate that responses will be provided within seven (7) business days of a request, to date, Mack has not received a response to either FOIA Request.

84.     Clearly, despite Mack's repeated attempts to work with Riverdale officials and through counsel to resolve any issues, Riverdale and its officials remain determined to continue

this harassment and unwilling to provide public record information that would aid Mack in determining just how arbitrarily it has been singled out by Riverdale officials for harassment and abuse.

85.    As there is no appeal process relating to a refusal to schedule inspections, denial of occupancy permits, or refusal to issue occupancy permits for properties with unpaid water bills, there are no administrative rights to exhaust prior to filing this action.  Mack has attended hearings on the various citations that have been issued, however, there is simply no procedure by which Mack can exhaust its administrative rights – Riverdale can simply keep issuing citations indefinitely, deny Mack permits on that basis, and effectively halt any business Mack may conduct in Riverdale.

86.    Mack has suffered damages as a result of the aforementioned harassment, abuse, and constitutional violations, in that he has been deprived of the use of, to date, four (4) properties due to an inability to schedule occupancy inspections or obtain certificates of compliance.  Moreover, Mack has incurred thousands of dollars in damages from frivolous and baseless citations issued by Riverdale officials as set forth herein.  Finally, Mack has incurred attorneys' fees and costs to defend itself at citation hearings, as well as to file and prosecute this action to protect his constitutional rights.

## COUNT I - § 1983 Violation of the Fourth and Fourteenth Amendments

### Against Village of Riverdale

### Crime Free Housing Program ("CFHP")

87.    Mack hereby realleges and incorporates Paragraphs 1-86 of this Complaint as though fully set forth herein.

88.     Mack has a legal and tangible ownership interest in several properties throughout Riverdale, and that interest has been compromised by the CFHP, Section 15.120.010 of the Riverdale Municipal Ordinance.

89.     Moreover, Officer Beatty has chosen to arbitrarily enforce the CFHP against Mack solely in order to harass and abuse Mack and its tenants.

90.     The CFHP is overly broad in that it regulates private housing as well as public housing.  Moreover, the CFHP is not limited to those property owners who receive federal or state subsidies or vouchers for tenant housing.  CFHP Section 15.120.010(F).

91.     The CFHP violates the Fourteen Amendment of the Constitution of the United States in that it is so vague as to fail to afford a property owner or tenant due process under the law.  Specifically, the CFHP calls for extreme action, the forced eviction of a tenant on private property by a landlord, for an extremely broad and undefined range of activities.  "The clause is to make criminal activity (not limited to violent criminal activity or drug related criminal activity engaged by, facilitated by, or permitted by the render, member of the household, guest or other party under the control of the renter) a lease violation."  CFHP Section 15.120.010(F).

92.     The scope of activity covered by the CFHP is not even limited to activity occurring on a specific property.  As such, the scope of activity described in the CFHP could include arrests of guests of a tenant for any criminal activity whatsoever after that guest has left the tenant's property.

93.     Moreover, the CFHP interferes with Mack's ability to contract with tenants, in that it requires property owners to attach a "crime free lease addendum" giving Mack the broad abilities to evict tenants on the merest suspicion of criminal activity.

94.     Riverdale, through Officer Beatty, has illustrated the overly broad scope of the CFHP in its actions against Mack at the 137 Property, with its tenant Classy Bailey.  Despite the fact that Ms. Bailey was never arrested or charged with criminal activity, and it is unclear whether any juvenile living at the 137 Property was arrested or charged with criminal activity, Mack received two citations for failing to evict Ms. Bailey.

95.     Mack has been and likely will be damaged in the future by the broad and arbitrary enforcement of the CFHP.  Namely, he has been forced to appear in administrative court to defend these violations, and has been told by Officer Beatty that more CFHP violations will be forthcoming.  Indeed, Beatty will almost certainly issue citation against Mack for violations of the CFHP related to the Normal property described above.

96.     Officers Beatty's actions in selectively targeting Mack with respect to its CFHP is both arbitrary and based on personal animus, and designed to prevent Mack from exercising its property rights without due process of law.

97.     Mack has been damaged as a result of Riverdale's actions in that it has been forced to defend or pay fines and violation notices received by Riverdale, it has been deprived of its right to rent various properties to tenants throughout Riverdale, and it has incurred attorneys' fees and costs in attempting to first resolve this dispute with Riverdale, then to file and prosecute this action pursuant to § 1983.

## COUNT II - § 1983 Violation of the Fourth and Fourteenth Amendments

### Against Village of Riverdale

### Building Inspector

98.     Mack hereby realleges and incorporates Paragraphs 1-86 of this Complaint as though fully set forth herein.

99.    Mack has a legal and tangible ownership interest in several properties throughout Riverdale, and that interest has been compromised by the provisions in Chapter 2.32.010 *et seq.* of the Riverdale Municipal Ordinance.

100.    Stinson, Jones, Van Dyke and Jarett have utilized the broad powers afforded them by the Code as authorized agents of the building inspector in order to harass and abuse Mack and its tenants.

101.    Section 2.32.100 of the Code violates the Fourth Amendment of the Constitution's prohibition on unreasonable search and seizure on its face, in that it impermissibly:

   a.    Allows the building inspector or any authorized agent of the inspector to enter *any* building, structure or premises at any reasonable hour;

   b.    Fails to require the building inspector to give an owner, tenant or other occupant of property any notice whatsoever of a warrantless inspection;

   c.    Fails to allow for a tenant, owner or other rightful occupant to refuse the building inspector access;

   d.    Fails to provide a procedure whereby an inspector must obtain a warrant in the event that he or she is denied access;

   e.    Makes the refusal to allow access to a building inspector a misdemeanor; and

   f.    Provides no procedure for redress to a tenant who wishes to file a complaint or grievance regarding a building inspector's search.

The Code, Section 2.32.100.

102.    Further, Section 2.32.130 violates the Fourth Amendment on its face in that it impermissibly:

   a.    Provides for a warrantless search by a building inspector;

   b.    Provides no procedure whereby a tenant or owner may refuse access to the building inspector;

   c.    Fails to define or limit the scope of a search by the building inspector for reoccupation, only indicating that the premises must "comply with the applicable ordinances of the village and are fit for human habitation;"

The Code, Section 2.32.130.

103.    The actions of Stinson, Jones, Van Dyke and Jarett are effectively authorized by the language of the Riverdale Code affording the building inspector impermissibly wide authority to conduct whatever search under whatever criteria he or she sees fit.

104.    Moreover, the Code violates the Fourteenth Amendment to the Constitution of the United States in that it is so vague as to fail to afford a property owner or tenant due process under the law.  Specifically, the Code fails to define the scope of reoccupation certification inspections, and fails to set forth a time frame between the time an inspection takes place and the point at which a certificate of reoccupation will be issued.  Finally, it fails to provide a time frame or procedure whereby a property owner can set up a re-inspection.

105.    Moreover, the Code deprives a property owner of his right to lease property without due process of law in that a certificate of reoccupation will not be issued until a property has been approved, regardless of whether a property owner wishes to dispute or appeal the findings of an inspection.

106.    Mack has specifically suffered injury as a result of the deprivation of due process – as indicated herein, Stinson has failed a property on reoccupancy inspection at least twice since August 2010 for trivial and unsubstantiated inspection items, only to fine Mack for allowing a tenant to move in when there was nothing it could do to pass inspection.

107.    Riverdale's actions in selectively targeting Mack with respect to its residential occupancy permit issuance are both arbitrary and based on personal animus, and designed to prevent Mack from exercising its property rights without due process of law.

108.    Mack has been damaged as a result of Riverdale's actions in that it has been forced to defend or pay fines and violation notices received by Riverdale, it has been deprived of its right to rent various properties to tenants throughout Riverdale, and it has incurred attorneys'

fees and costs in attempting to first resolve this dispute with Riverdale, then to file and prosecute this action pursuant to § 1983.

### COUNT III - § 1983 Conspiracy

### Against All Defendants

109.     Plaintiff reincorporates and realleges Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

110.     The individual Defendants, Stinson, Jones, Van Dyke, Jarrett and Beatty conspired to utilize the broad powers afforded them under the Code, CFHP and other Riverdale Municipal Ordinances relating to water bills and zoning to harass and abuse Mack and its employees, agents and tenants.

111.     The CFHP, the Code, and the interpretation and ratification of the broad powers contained therein by the individual Defendants Stinson, Jones, Van Dyke, Beatty and Jarrett were the direct and proximate cause of the constitutional violations set forth herein.

### COUNT IV – § 1983 Abuse of Governmental Power

### Against the Individual Defendants

112.     Plaintiff reincorporates and realleges Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

113.     The individual Defendants, Stinson, Jones and Van Dyke abused the broad powers afforded them under the Code and Riverdale Municipal Ordinances relating to water bills and zoning to harass and abuse Mack and its employees, agents and tenants.

114.     The individual Defendant, Chief Jarrett abused and continues to abuse the broad powers afforded him as Chief of the Riverdale Fire Department, which includes supervisory duties over building and safety permitting issues.

115.   Officer Beatty abused the broad authorities afforded him as an officer with Riverdale's Police Department and under the CFHP to harass and abuse Mack and its employees, agents and tenants.

116.   The CFHP, the Code, and the interpretation and ratification of the broad powers contained therein by the individual Defendants Stinson, Jones, Van Dyke, Beatty and Jarrett were the direct and proximate cause of the constitutional violations set forth herein.

## COUNT IV – 745 ILCS 10/9-102 Claim

### Against Village of Riverdale

117.   Plaintiff reincorporates and realleges Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

118.   Defendant Village of Riverdale is the employer of the individual Defendants Stinson, Jones, Van Dyke, Jarrett and Beatty (the "Individual Defendants").

119.   The Individual Defendants committed the acts set forth herein under color of law and in the scope of their employment with Riverdale.

120.   The conduct of the Individual Defendants has been ratified and authorized by Riverdale, as evidenced by the notice given to Riverdale of this conduct and failure of Riverdale to discipline or regulate the Individual Defendants' conduct in any way.  Indeed, at the request of Jarrett, Mack submitted a written complaint detailing some of his issues with Stinson, Jones and Van Dyke.  Despite assuring Mack that he would investigate and address Mack's complaints, Jarrett never responded (in any fashion) to Mack or took any action against Van Dyke, Stinson and Jones.

**COUNT V – Supplementary Claim for *Respondeat Superior***

**Against Village of Riverdale**

121.    Plaintiff reincorporates and realleges Paragraphs 1 through 86 of this Complaint as though fully set forth herein.

122.    The Individual Defendants at all times relevant hereto were employed by Riverdale.

123.    The acts of the Individual Defendants as described herein were made in the scope of their employment with Riverdale.

124.    Riverdale, as principal, is liable for the actions of its agents Stinson, Jones, Van Dyke, Jarrett and Beatty under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff, Mack Industries, Ltd. respectfully requests this Court enter judgment in its favor and against Defendants, Village of Riverdale, George Stinson, Alvin Jones, Christopher Van Dyke, Officer Beatty and Chief Jarrett, jointly and severally, in an amount to be determined at trial, plus attorneys' fees and costs, and for any additional relief this Court deems equitable and just.

Dated: November 11, 2010                               Respectfully submitted,

                                                      MACK INDUSTRIES, LTD.

                                                      By:    s/James R. Pittacora
                                                             One of its Attorneys

James R. Pittacora
Elizabeth S. Stevens
Tarik M. Kershah
PITTACORA & CROTTY, LLC
9550 W. Bormet Drive, Suite 205
Mokena, IL 60448
(708) 390-2800 Office
(708) 390-2801 Facsimile
jp@pittacoracrotty.com
es@pittacoracrotty.com